RUBIE P. BEATTIE *v.* W. CRAIG TRAYNOR, ADMR. OF ESTATE OF CLARENCE A. SMITH.

May Term, 1946.

Present: MOULTON, C. J., SHERBURNE and STURTEVANT, JJ., and CLEARY and ADAMS, Supr. JJ.

Opinion filed October 1, 1946.

*Witters & Longmoore* for the defendant.

*Clifton L. Drew* and *Lee E. Emerson* for the plaintiff.

SHERBURNE, J. This is an appeal from the disallowance of a claim against the estate of the late Clarence A. Smith, based upon a contract alleged to have been made between him and the plaintiff for the care and support of an illegitimate child named Clarence James Smith, and for the use and benefit of the child. The case has been here once before upon the pleadings, and reference is had to the opinion reported in 114 Vt 238, 42 A2d 435. There was a trial upon the merits resulting in a verdict and judgment for the plaintiff, and the case is again here.

Plaintiff's evidence tended to show that she had kept house for Frank Randall since 1916; that on February 14, 1932, she gave birth to a child, the son of the decedent, Clarence A. Smith; that owing to complications she stayed 6 weeks at the hospital and did not return to Randall's for a few weeks longer; and that when she left the hospital the child was taken to the home of a near neighbor of Mr. Smith, and kept there at his expense until the date of a conversation between Mr. Smith and the plaintiff at Randall's house one evening in July, 1933, at which time the claimed contract

was made. All of the direct evidence relative to this conversation came from Randall. He testified that the plaintiff told Mr. Smith that she was going to get this baby and take it away, and that she expected him to support the child, and that if he didn't, she would bring suit against him. He replied that he didn't want anything like that, and said that he would pay her $1000.00 a year for the maintenance and support of the child, and would give her $2500.00 a year for the education, training and benefit of the child, and that she should bring the child to Randall's and stay there with it, and he further said that he would pay her this money until the child was 21 years old, or either he or the child died. To all this the plaintiff replied that that was all right. No objection, further than to the form of several questions asked, was made to Randall's testimony about this conversation until he was asked about what the plaintiff said to the proposition, and to which Randall answered as in the last sentence, but, after the witness had concluded his testimony about what Mr. Smith said, the defendant moved that this testimony be stricken because it appeared that the alleged contract was not in writing, and was within the statute of frauds, in that it was not to be performed within one year from the making thereof. The testimony as to what the plaintiff said to the proposition was received subject to this objection. We need not decide whether the objection came too late, but will treat the exceptions as properly raising the question of the statute of frauds.

P. L. 1675 provides: "An action at law or in equity shall not be brought . . . upon an agreement not to be performed within one year from the making thereof; unless the promise, contract or agreement, upon which such action is brought, or some memorandum or note thereof, is in writing, and signed by the party to be charged therewith, . . ." This statute is like the early English statute. The settled construction of this statute in England, before the Declaration of Independence, was that an oral agreement which, according to the intention of the parties, as shown by the terms of the contract, might be fully performed within a year from the time it was made, was not within the statute, although the time of its performance was uncertain, and might probably extend, and be expected by the parties to extend, and did in fact extend, beyond the year; and this is the construction adopted in our own cases. *Lawrence* v. *Stewart*, 109 Vt 333, 343, 196 A 750; *Dyer* v. *Lalor*,

94 Vt 103, 118, 109 A 30; *Blanchard* v. *Weeks*, 34 Vt 589, 591; *Sherman* v. *Champlain Transportation Co.*, 31 Vt 162, 182, and cases cited therein. Many of the early English cases are reviewed in *Blanchard* v. *Weeks, supra,* and by Mr. Justice Gray in *Warner* v. *Texas & Pacific R. Co.*, 164 US 418, 17 S Ct 147, 41 L ed 495, a case cited in *Lawrence* v. *Stewart, supra.*

The factual situations in our cases fairly illustrate the rule. In *Sherman* v. *Champlain Transportation Co., supra,* the contract was one that by its terms would extend through an indefinite period of years, unless terminated by the act of one of the parties, who had the right to terminate it when he chose. By the terms of the contract it is evident that the parties contemplated it would continue through a period of years, as it did, in fact. The Court held it not to be within the statute, saying, "It seems to us very certain that to the class of cases to which this belongs, that is, where the consummation of the contract depends upon the election of one party, or any other contingency which may happen within the year, the statute of frauds has no application." In *Blanchard* v. *Weeks, supra,* an agreement to refrain from the practice of medicine at McIndoe's Falls while the plaintiff should reside and practice there, "and forever," was held not to be within the statute, as it depended upon the contingency of death, which might happen during the year. In *Dyer* v. *Lalor,* supra, a marriage contract which might, by its terms, have been fully performed within one year, although it in fact extended beyond that time, was held not to be within the statute. In *Lawrence* v. *Stewart, supra,* a case involving an agreement for the support of the aged mother of the parties during her lifetime, the court said: "The contract here involved was the personal contract of the plaintiff. It was to be performed by her, alone. It could not become binding upon her representative or any other person. It continued only through the lifetime of Bridget Stewart, and terminated at her death. Unless sooner ended in some legal way, it was fully performed at that time. Upon the same hypothesis, it would be fully performed on the plaintiff's death. So this contract might be fully performed within one year from the time it was entered into. To such a contract the Statute of Frauds does not apply."

The defendant calls our attention to the last paragraph in the opinion in *Hinckley* v. *Southgate,* 11 Vt 428, 430, which suggests

that, if the time of performance depends upon contingency, the test is whether the contingency will probably happen, or may reasonably be expected to happen, within the year, and ends with this sentence: "But where the contract is not expected to be performed within the year, but depends upon a contingency, which may, by mere possibility, occur within the year, it would seem but a reasonable strictness of construction, to require the contract to be reduced to writing. Such was, in effect, the case of *Boydell* v. *Drummond*, 11 East 142, 11 Swifts Dig. 263." The contract in this case was in express terms to carry on a mill for a year from a future day, and this paragraph of the opinion was not necessary to the decision of the case, and cannot stand with the other authorities. In fact the cited case of *Boydell* v. *Drummond*, as shown in *Blanchard* v. *Weeks, supra*, and in *Warner* v. *Texas & Pacific R. Co., supra*, does not support the conclusion. As said in the former case: "although the court held the contract within the statute, it was expressly on the ground that by the terms of the agreement it was not to be, and could not legally be, performed within the year."

*Peters* v. *Inhabitants of Westborough*, 19 Pick, Mass, 364, concerns an agreement much like the one in the instant case. There one Catherine Ladds came into the plaintiff's family in March, 1834, when she was 11 or 12 years of age, and remained there until her death, which took place on May 31, 1835, after a sickness of four or five months; and the defendants proposed to show by parol evidence, that a short time before Catharine went into the plaintiffs family, it was agreed between him and her father, that the plaintiff should take her into his family and employment for one month, on trial, and if, at the end of the month, he was not satisfied with her, he might return her to her father, but that, otherwise he should support her until she was 18 years of age, and should not return her for any cause but bad conduct on her part; that, in pursuance of this agreement, she went into the family of the plaintiff, and that at the end of the month the plaintiff expressed himself to be satisfied with her, and never offered to return her to her father. The Court said: "The performance of the plaintiff's agreement with the child's father, depended on the contingency of her life. If she had continued in the plaintiff's service, and he had supported her, and she had died within a year after the making of the agreement, it would have been fully performed. And an agreement by

parol is not within the statute when by the happening of any contingency, it might be performed within a year."

The agreement was not within the statute, and defendant's exceptions are not sustained.

Mr. Smith died on October 19, 1942. On his direct examination Randall testified to hearing a talk between the plaintiff and Smith about a year or a year and a half before he died, relative to the payment of money on the contract, in which Smith said; "I guess I am worth a quarter of a million or more." Nothing further was developed in the direct examination as to the wealth of Smith, but upon cross examination Randall testified that he had known Smith since 1898 when he had no business of his own and was just a young fellow; and that he knew that he had several grain stores, and a home, and that Smith had told him he was worth considerable money. He was then asked, "Whatever he had he got by his own efforts, as far as you know?" The question was objected to, and defendant's attorney stated, "They went into that yesterday, how much he was worth. We wish to show what he had he got by his own efforts, as bearing on the probability of whether he ever made any such contract . . . a man who earns his own money." Whereupon the question was excluded, subject to exception. The question was not proper cross-examination. It is very doubtful if the mere fact that Smith acquired his wealth by his own efforts rendered the making of such a generous contract improbable, but the question could have been properly excluded because leading, and because it had not been shown that Randall had any knowledge of how Smith got his property. This exception is not sustained.

Randall testified to a talk with Mr. Smith before the child was born in which he stated that he had got himself into a "mix-up," that he had no children of his own and hoped the plaintiff would carry the child through so that he could name it after himself. He also testified to Mr. Smith's arrangements for the plaintiff to employ a certain doctor and to go to the hospital, all at his expense. From July 1933, when the child was brought to Randall's, to the time of his death, Smith called there frequently, sometimes as often as twice a week. He used to come in and carry him around, lie on the bed and play with him, and take him out riding. In addition to the foregoing Randall was permitted to testify, subject to defendant's exception, that Smith gave the boy a horse, two bicycles, a

.wrist watch, and $140.00 to $150.00 in money. The objection was that the evidence had no tendency to prove the contract. Along with the other circumstances it was clearly admissible on the issue of paternity, a vital element in the case. This exception is not sustained.

Subject to the exception of the defendant a group photograph showing Smith, his sister and another person, when Smith was about 27 years of age, was received for the purpose of allowing the jury to make comparison of the likeness of Smith and the boy as he appeared in court, then 13½ years old. Smith's sister testified that the photograph was a fair reproduction of the way her brother looked at the time it was taken, and the court made a personal examination of the features of the boy, for the purpose of comparison with the photograph, before receiving it. In *Lohsen* v. *Lawson*, 106 Vt 481, 486, 488, 174 A 861, 95 ALR 309, a case where the question of the propriety of exhibiting a child to the jury as evidence of its paternity was presented, we held that the sound rule is to admit the fact of similarity of specific traits, however presented, provided the child is in the opinion of the court old enough to possess settled features or other corporal indications, subject to the qualification that we would not necessarily limit the evidence to specific traits because of the possibility of a case arising of an unmistakable family resemblance which cannot be analyzed. No question could be raised in this case that a boy 13½ years old was not old enough to possess settled features, and had Mr. Smith been alive and in court it would have been proper to proffer the two for examination by the jury.

A photograph, like a map or diagram, is merely a witness' pictured expression of the data observed by him and therein communicated to the tribunal more accurately than by words, and its admission, when properly verified, rests on the relevancy of the fact pictured. Wigmore on Evidence, § 792. Photographs may be proved and used in evidence in the same manner as maps or diagrams, and they may be verified either by the testimony of the person who took them, or by the testimony of others who can state that the object sought to be shown is fairly represented thereby. *Davis* v. *Dunn*, 90 Vt 253, 258, 98 A 81, Ann Cas 1918 D 994. Under the rule adopted in *Lohsen* v. *Lawson, supra,* the photograph was properly received. See also *Shorten* v. *Judd*, 56 Kan 43, 42 P 337, 54 Am St Rep 587, for a somewhat similar case. This exception is not sustained.

The defendant showed by W. Craig Traynor, the defendant administrator, that he had been employed by Mr. Smith since 1924, and had charge of his office and books and records, and as accountant prepared annual statements and balance sheets showing his worth, that in 1933 Mr. Smith's assets were over $150,000.00, and from then to the time of his death would average $200,000.00 at least, and his highest liabilities during that time were about $8500.00. After showing in some detail different items of Smith's property, the witness was asked if any of the annual statements made by him after 1933 showed any liability to the plaintiff, and answered "No." This was objected to and excluded, after the defendant had stated that "it goes to the probability of the contract in issue having been made." Then the witness was asked when he first learned that the plaintiff made any claim against Smith or his estate, under an offer to show that he first learned of it after Smith's death, and the claim that it was admissible as bearing upon the probability of whether the plaintiff had a claim, the fact that for nine years she never asserted any claim, and the question was excluded. In his brief after setting forth a copy of the transcript regarding these exceptions the defendant states that the alleged contract having been made nine years prior to Smith's death and no effort having been made to enforce it during his lifetime, it was competent to show that Smith was financially responsible from the time of making the alleged contract, and that the witness never learned of it until after Smith's death, as bearing upon the probability of any such contract having been made. As evidence was received of Smith's finances, and the plaintiff never brought any action against Smith in his life time, and the court charged the jury that her failure to do so was a factor in determining whether there was in fact an agreement or contract such as the plaintiff claimed, the only possible ground of error in the exclusion of the questions concerns the witness' knowledge, which, for aught that appears, was limited· to what Smith told him. It therefore amounts to a refusal to let the witness state that Mr. Smith never told him about such a contract. If error, we are unable to see how the defendant was harmed by the exclusion. This exception is not sustained.

The defendant offered a certified copy of the record of the marriage of Mr. Smith and Bertha Mae Wardwell on November 20, 1911, and offered to show, in case the copy was received, that

this marriage relation continued until Mr. Smith's death, as bearing upon the probability of whether Mr. Smith was the father of the child and whether he would make so improbable a contract knowing that he had a wife, claiming that it was less likely that a married man with business experience would have sexual intercourse with the plaintiff than a single man, and less likely that he would make any such contract. It is possible that as our law stood before the decisions of *Tyrell* v. *Prudential Insurance Co.*, 109 Vt 6, 23, 25, 192 A 184, 115 ALR 392, and *State* v. *Lizotte*, 109 Vt 378, 387, 388, 197 A 396, proof that Smith was a married man might have been received so as to afford him the benefit of the presumption of innocence of the crime of adultery; but since the presumption of innocence now has no probative value, and since evidence had been introduced which fairly and reasonably tended to show that Smith was the father of the child, the presumption had disappeared.

It is a matter of fine speculation whether a married man with business experience and of substantial means would be less likely to have illicit sexual intercourse or to make such a contract than a single man. We have been referred to no statistical studies upon the subject. There is considerable question whether marital fidelity is any greater in those jurisdictions where adultery is a crime, than in those jurisdictions where it is not. By reputation in any community the greater number of, and the most promiscuous, seducers of women are often married men, and able business men and men of wealth are no exception. This exception is not sustained.

At the close of all the evidence the defendant moved for a directed verdict, and later moved to have the verdict set aside. Both motions were denied, subject to exception. The only ground for these motions that is briefed is based upon the testimony of the witness Randall, heretofore noted, relative to a talk between the plaintiff and Mr. Smith about the payment of money on the contract, as follows: "It was about a year or a year and a half before Mr. Smith died, and she spoke to him again about it and he said, 'I will pay you that thousand dollars,' and he says, 'I will take out an annuity policy for $50,000. for Clarence,' and she said, 'That is allright if you do it, but what if something happened to you, what would I do?' He said 'I guess I am worth a quarter of a million or more,' and he said, 'I guess my estate is good for it.' " It was claimed that this testimony showed a modification or merger of the

alleged contract into a new and different contract, so as to bar recovery on the contract alleged to have been made in 1933.

At the time of this talk Smith had never paid the plaintiff anything on his contract with her, and was over eight years in arrears on the payments due thereunder. The following rules adduced from our cases are applicable to the situation: An unexecuted accord is not a bar to an action on the original undertaking. When a creditor accepts the mere promise of his debtor to perform some act in the future in satisfaction of the debt, the mere promise itself, without performance, is sufficient to extinguish the debt but in such case it must clearly appear that it was the mere promise itself that the creditor agreed to accept in satisfaction of his debt. When the performance of the new promise was the thing to be received in satisfaction then, until the performance, there is not complete accord; and the original obligation remains in force. *Hall* v. *Gifford*, 100 Vt 347, 350, 137 A 193, 53 ALR 204; *Sargent* v. *Donahue*, 94 Vt 271, 274, 110 A 442; *Manley* v. *Vermont Mutual Fire Ins. Co.*, 78 Vt 331, 335, 336, 62 A 1020, 6 Ann Cas 562; *Hard* v. *Burton*, 62 Vt 314, 322, 20 A 269. Consequently, unless the plaintiff accepted Smith's mere new promise in discharge of the debt for arrears, and of further payments under the contract, rather than performance of the new promise, there was not a complete accord, and the original obligation remained in force. As we construe the plaintiff's reply to Smith's offer she agreed to accept performance, but not the promise, in discharge of the contract with him. Because of Smith's failure to perform his promise before his death, a year or more afterwards, it is unnecessary to determine whether he had a reasonable time in which to do so under the rule stated in § 417 of Rest. of Contracts. These exceptions are not sustained.

The last exceptions briefed relate to the refusal of the court to charge as requested. The particular requests were based upon the erroneous theory that the plaintiff accepted Smith's mere promise, rather than its performance, in discharge of her contract with him. These exceptions are not sustained.

*Judgment affirmed.*